IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MK AVIATION, S.A.,       §
      §
    Plaintiff,       §
      §
v.       §     Civil Action No. 3:05-CV-1346-N
      §
SOUTHWEST AIRLINES COMPANY,       §
      §
    Defendant.       §

## <u>ORDER</u>

Before the Court is Plaintiff MK Aviation, S.A.'s ("MK Aviation") Motion for Partial Summary Judgment [52] and Defendant Southwest Airlines Company's ("Southwest") Motion for Summary Judgment [49]. Because the Court finds that Southwest correctly interprets the lease agreements, the Court grants Southwest's motion for summary judgment with respect to MK Aviation's breach of contract claims relating to the return condition of the Aircraft, as well as to MK Aviation's quantum meruit and unjust enrichment claims. However, the Court finds that a genuine of issue of material fact exists regarding the return of the Aircraft, and therefore denies both Southwest and MK Aviation's motions for summary judgment with respect to MK Aviation's breach of contract claim for additional rent.

## I. SOUTHWEST'S LEASE OF THE AIRCRAFT

This litigation concerns the interpretation of two identical contracts governing Southwest's lease of passenger aircraft. In May 1991, Southwest contracted to lease two

Boeing aircraft, identified by the FAA as N721WN ("Aircraft 721") and N722WN ("Aircraft 722") (collectively, "the Aircraft"). Although not an original party to the lease agreements, MK Aviation was the recognized lessor of the Aircraft at the end of the lease term, having acquired the Aircraft during the term of the lease.

The lease agreements provide that Southwest pay monthly rental fees of $82,500 per aircraft to the lessors of the Aircraft until the termination of the lease on October 15, 2004. The lease agreements also provide for the payment of compensation, either from the lessee to the lessor or vice versa, based on the return condition of the Aircraft. Relevant to the parties' dispute, the lease agreements specify the required return condition of the Aircraft as to the engines, airframes, and landing gears.

Pursuant to the terms of the lease, Southwest was to return the aircraft to MK Aviation on October 15, 2004. According to Southwest, it attempted to return the Aircraft on this date, but MK Aviation refused to accept the Aircraft due to Southwest's alleged noncompliance with the return conditions specified in the lease agreements. Specifically, MK Aviation alleges that Southwest failed to comply with the return conditions set forth in the lease agreements regarding the engine cycles, airframes, and landing gears. Additionally, MK Aviation claims that Southwest did not properly tender the Aircraft on October 15, 2004 because it failed to return the Aircraft with the necessary manuals and logbooks. MK Aviation eventually accepted return of the aircraft on November 5, 2004, and the parties executed Return Acceptance Receipts to reflect the terms and conditions for the return of the

Aircraft, specifically reserving certain rights and remedies related to the parties' dispute about the return condition of the aircraft.

In March 2005, MK Aviation filed suit asserting claims for breach of contract, quantum meruit, and unjust enrichment. Specifically, MK Aviation alleges that Southwest owes compensation for failing to comply with the return conditions relating to the Aircraft's engines, airframes, and landing gears. MK Aviation also alleges that Southwest owes additional rent because Southwest did not return the Aircraft until November 5, 2004, twenty-one days after the return date specified in the lease. In response, Southwest filed a counterclaim for declaratory judgment, asking the to Court declare the contractual rights and obligations of the parties relating to the return condition of the Aircraft and to Southwest's obligation to pay additional rent under the terms of the Return Acceptance Receipts, in which MK Aviation allegedly waived any right to the additional rent. Additionally, Southwest has asserted a claim for breach of contract relating to the return condition of the airframes, as well as claims for quantum meruit and unjust enrichment, by which it seeks to recover the cost of storing the Aircraft between October 15, 2004 and November 5, 2004. MK Aviation moves for summary judgment on its breach of contract claims. Southwest moves for summary judgment on all of MK Aviation's claims, as well as its own claims for declaratory judgment and breach of contract.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is a genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A fact is material only when its resolution affects the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute over a material fact is genuine if, based on the evidence, a reasonable jury could return a verdict for either party. *Id.* at 252. In ruling on a motion for summary judgment, the Court must accept the nonmoving party's evidence and draw all justifiable inferences in its favor. *Id.* at 255.

A party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. The moving party may meet this burden by either (1) presenting evidence that affirmatively demonstrates the absence of any genuine issue of material fact, or (2) after adequate time for discovery, demonstrating that "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, the nonmoving party cannot defeat summary judgment by resting upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue of fact. *Id.* at 324.

### III. BREACH OF CONTRACT CLAIMS

MK Aviation alleges that Southwest breached the lease agreements by failing to comply with the return conditions relating to the engines, airframes, and landing gear, as well as by failing to properly and timely return the Aircraft. The parties agree that Texas law

ORDER – PAGE 4

governs this dispute.[1]   Under Texas law, to prevail on a claim for breach of contract, the plaintiff must establish that: (1) there is a valid, enforceable contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff suffered damages as a result of the breach.  *MG Bldg. Materials Ltd. v. Moses Lopez Custom Homes, Inc.*, 179 S.W.3d 51, 61 (Tex. App. – San Antonio 2005, pet. denied).  Here, the main question presented to the Court is whether either party breached the lease agreements.  The parties agree on the facts that are material to this determination; their dispute centers on the interpretation of the relevant sections of the lease agreements.

The interpretation of an unambiguous contract is a question of law for the court.  *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999).  Whether a contract is ambiguous is also a matter of law.  *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (per curium).  Here, the contract terms at issue are unambiguous, as they can be given a certain and definite legal meaning.  *See Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000).   Neither party argues that the terms are susceptible of more than one meaning; rather, each party interprets the same language to come to opposite conclusions.  *See id.* (stating that "[a]n ambiguity does not arise simply because the parties advance conflicting interpretations of the contract").  Accordingly, the interpretation of the lease agreements is a matter of law for the Court.

---

[1]Section 19.2 specifies that the lease agreements "shall in all respects be governed by, and construed in accordance with, the laws of the State of Texas applicable to contracts . . . ."

ORDER – PAGE 5

The principles governing contract interpretation are well-established. "Where a written contract is clear and certain, the instrument will be deemed to express the intention of the parties and will be enforced as written, no matter what their actual intention may have been." *EOG Res., Inc. v. Hanson Prod. Co.*, 94 S.W.3d 697, 701 (Tex. App. – San Antonio 2002, no pet.). When interpreting an unambiguous contract, the Court must "examine[] the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless." *MCI Telecomms. Corp.*, 995 S.W.2d at 652. In doing so, the Court may not consider extrinsic evidence to contradict, add to, or vary the meaning of the contract; the Court may not resort to extrinsic evidence to establish the meaning of the contract unless it first deems the contract ambiguous. *Atlantic Lloyd's Ins. Co. v. Butler*, 137 S.W.3d 199, 210 (Tex. App. – Houston [1st Dist.] 2004, pet. denied).

### A. Engine Cycles

MK Aviation alleges that Southwest failed to return the Aircraft in accordance with section 5.1.6 of the lease agreements, which sets forth the required condition of the engines upon return of the Aircraft. Section 5.1.6 required Southwest to return the Aircraft with a specified life remaining – 2,000 cycles and 1,735 cycles for engines A and B, respectively – "until the next scheduled removal and replacement of a life limited part (rotating part) under the Engine Maintenance Program." The lease agreements obligated Southwest to pay MK Aviation compensation of $61.25 per cycle for any deficiency in the number of remaining cycles, and obligated MK Aviation to pay Southwest compensation in the same

amount for any excess in the number of remaining cycles.  The total adjustment for MK Aviation could not exceed $250,000 per aircraft.

The parties disagree on what constitutes the "next scheduled removal and replacement . . . under the Engine Maintenance Program."  Measuring the remaining number of cycles against the next scheduled removal or replacement according to its own maintenance program, Southwest calculated an excess number of remaining cycles for both aircraft and offset a total credit of $500,000 from the balance it owed MK Aviation as compensation for that excess.  MK Aviation argues that this calculation is erroneous because it fails to account for the removal of the engines on or before July 17, 2005, as required under an FAA Airworthiness Directive.  According to MK Aviation, compliance with FAA Airworthiness Directives is a necessary aspect of Southwest's maintenance program and, therefore, the July 17 compliance date is actually the next scheduled removal under the lease.  Measuring the remaining number of cycles against that date, MK Aviation calculated that Southwest owes MK Aviation $2,327.50 for a deficiency in the remaining number of engine cycles.  The Court, however, finds that Southwest's calculation is correct under the terms of the lease agreements.

Pursuant to section 5.1.6, the number of engine cycles remaining when Southwest returned the Aircraft is calculated in reference to "the Engine Maintenance Program" ("EMP"), which Southwest explains is part of its overall maintenance program for aircraft. "Maintenance Program" is specifically defined in section 8.1.1, and merely requires Southwest to keep the Aircraft in good operating condition so as to maintain the FAA

certificate of airworthiness at all times.  Neither section 5.6.1 nor section 8.1.1 reference compliance with FAA Airworthiness Directives, and thus by their language, do not appear to encompass such compliance.  Accordingly, the Court finds that section 5.1.6 does not contemplate using Airworthiness Directives as a marker for measuring the remaining number of engine cycles.

MK Aviation urges the Court to adopt a contrary interpretation of section 5.6.1, arguing that Southwest's obligation to maintain the Aircraft's certification with the FAA under section 8.1.1 indicates that the term "Maintenance Program" encompasses compliance with FAA Airworthiness Directives.  MK Aviation further argues that compliance with FAA Airworthiness Directives and other federal regulations is mandatory and, therefore, an essential aspect of any airline's maintenance program, including Southwest's.  Thus, according to MK Aviation, the number of engine cycles remaining when Southwest returned the Aircraft must be calculated in reference to the July 17 compliance date.

The Court finds that MK Aviation's interpretation of section 5.1.6 is unreasonable because it renders meaningless the provisions of the lease agreements that set forth Southwest's obligation to comply with Airworthiness Directives.  Sections 5.3 and 8.1.2 specifically address Southwest's obligation to comply with government mandates during the term of the lease agreements.  Section 5.3 requires Southwest to comply with all applicable FAA Airworthiness Directives prior to returning the Aircraft to MK Aviation, but excepts from this obligation "any such FAA Airworthiness Directives . . . that permit compliance after the return date and would not, in the normal course of the Maintenance Program, be

complied with on or prior to the return date." Likewise, section 8.1.2 states that Southwest "will at its own expense, comply with all . . . directives . . . which are made mandatory by the FAA . . . and which require compliance during the [t]erm and prior to the return of the Aircraft under the lease." Reading compliance with Airworthiness Directives into the definition of "Maintenance Program" would render these provisions mere surplusage, for there would be no reason to add these provisions if section 8.1.1 included compliance with Airworthiness Directives. Furthermore, these provisions allocate the financial responsibility for compliance with Airworthiness Directives, such that Southwest would bear the cost of compliance required during the term of the lease, while the lessor would bear the cost of compliance permitted after the return of the Aircraft. Thus, calculating the remaining number of engine cycles in reference to the July 17 compliance date would frustrate the intent of these provisions, as it would shift the cost of compliance to Southwest.

Accordingly, the Court finds that Southwest correctly credited itself $500,000 for the excess in remaining number of engine cycles and is, therefore, entitled to summary judgment on MK Aviation's engines cycles claim.

### B. Airframe

MK Aviation alleges that Southwest breached the lease agreements by returning the Aircraft with less than the required number of days remaining until the next "D" check of the airframe. Section 5.3.1 of the lease agreements requires Southwest to return the Aircraft with "a minimum of 50% of the days remaining . . . until the next required full 'D' check." If Southwest returned the Aircraft with less than the requisite number of days remaining,

section 5.4.1 directs Southwest to pay MK Aviation compensation based on the shortfall. A full "D" check occurs every 3,650 days; thus, in order to avoid paying MK Aviation compensation, Southwest had to return the Aircraft with at least 1,826 days remaining until the next required full "D" check.

Southwest failed to return the Aircraft with at least 1,826 days remaining until the next required full "D" check. This much is clear. The parties, however, dispute what the lease agreements mean by "full 'D' check," and as a result, disagree on the number of days by which Southwest fell short. The lease agreements do not define the terms "'D' check" or "full 'D' check;" therefore, the Court must interpret the terms according to their ordinary meaning. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005).

A "D" check is a maintenance event in which the airframe is serviced, or at times, overhauled. Southwest has a segmented "D" check system by which certain maintenance tasks are conducted at varying intervals. Within this system, there are three types of "D" checks: a ¼ "D" check, a ½ "D" check, and a full "D" check. A full "D" check occurs every ten years, a ½ "D" check every five years, and a ¼ "D" check every two-and-a-half years. The full, ½, and ¼ "D" checks involve different kinds and levels of maintenance and occur at different intervals; however, all tasks associated with a ¼ and ½ "D" check are also completed at the time of a full "D" check. When Southwest returned the Aircraft to MK Aviation, both Aircraft 721 and Aircraft 722 had a ¼ and a ½ "D" check scheduled before the next full "D" check was to be performed.

Southwest interprets section 5.3.1 to require it to return the Aircraft with a minimum of 1,826 days until the next *full* "D" check, as distinguished from a ¼ or ½ "D" check. Using the next required full "D" check after the return of the Aircraft as its reference point – and not the intervening ¼ or ½ "D" check – Southwest calculated that it returned the Aircraft with a combined shortfall of 313 days and paid MK Aviation compensation accordingly.

MK Aviation argues that Southwest's shortfall calculation is erroneous because the correct date for measuring the shortfall is the next scheduled "D" check *event* – regardless of whether that event is considered a ¼, ½, of full "D" check under Southwest's maintenance program. According to MK Aviation, the phrase "next required full 'D' check" in section 5.3.1 encompasses all "D" check events, as "full 'D' check" refers to the series of "D" checks that occur over a ten-year period and not to a specific maintenance event that occurs at one time. Thus, MK Aviation reads the lease agreements as requiring Southwest to return the Aircraft with at least 1,826 days until the next "D" check – be it a ¼, ½, or full check. Using the first scheduled "D" check for the Aircraft – the ¼ "D" check – as its reference point, MK Aviation concludes that Southwest owes compensation for a combined shortfall of 2,931 days.

In an effort to settle the parties' dispute, Southwest agreed to increase the amount of compensation owed to MK Aviation by using the next ½ "D" check for each Aircraft as the reference point for measuring the shortfall, resulting in the payment of compensation for a combined total of 1,063 days. Although MK Aviation accepted the increased compensation, it nonetheless continues to demand that Southwest pay compensation for the 2,931-day

ORDER – PAGE 11

shortfall.  For this reason, Southwest has asserted a counterclaim for breach of contract, and seeks to recover its overpayment of compensation.

The Court agrees with Southwest's interpretation of section 5.3.1, and finds that it owes compensation for only a 313-day shortfall.  First, MK Aviation's interpretation is inconsistent with the express terms of section 5.3.1, which specifies that Southwest must return the Aircraft with a minimum number of days remaining until the "next required *full* 'D' check."  MK Aviation argues that its interpretation of section 5.3.1 is consistent with the terms of the provision because "full 'D' check" refers to the entire cycle of "D" check segments, i.e., ¼ and ½ "D" checks are pieces of a full "D" check.  But, section 5.3.1 does not use the phrase "next partial 'D' check," "next 'D' check event," or some other variation that would more clearly indicate an intent to use *any* "D" check as a reference point for calculation of compensation.  The Court presumes that had the parties intended for compensation to be based on the number of days remaining until the next "D" check of any type, they would have stated so in a more direct fashion.[2]

Second, MK Aviation's interpretation is unreasonable because it renders meaningless much of the language in sections 5.3.1 and 5.4.1.  As previously stated, the lease agreements require Southwest to return the Aircraft with 1,826 days remaining until the "next required full 'D' check."  MK Aviation interprets this provision as requiring Southwest to return the Aircraft with at least 1,826 days remaining until the next ¼, ½, or full "D" check.  However,

---

[2] For comparison, the Court notes that section 5.3.1 also requires Southwest to perform a "complete 'C' check or its equivalent (all phases) on the airframe" within a specified number of days prior to return of the Aircraft.

ORDER – PAGE 12

there are only two-and-one-half years, or 913 days, between ¼ "D" checks; thus, MK Aviation's interpretation would make it impossible for Southwest to comply with section 5.3.1 because there will always be less than 1,826 days between ¼ "D" checks. Furthermore, section 5.4.1 requires Southwest to compensate MK Aviation "in the event that" it fails to comply with section 5.3.1. MK Aviation's interpretation of section 5.3.1, however, would nullify the conditional language of section 5.4.1 because Southwest could never comply with section 5.3.1.

MK Aviation claims that its interpretation of section 5.3.1 is reasonable in light of prior versions of the lease. Without commenting on the admissibility of this evidence, the Court notes that MK Aviation's discussion of prior versions of the lease does not support its argument. Prior versions of the lease required Southwest to pay "D" check compensation up front, in the form of reserves. The amended lease agreements, however, delete the reserve payment provisions, requiring Southwest to pay compensation upon return of the Aircraft only if and to the extent that it fails to return the Aircraft with the minimum number of days remaining until the next full "D" check. MK Aviation argues that the amount Southwest would have paid in reserves under prior versions of the lease equals the amount it is required to pay in compensation under its interpretation of sections 5.3.1 and 5.4.1, and MK Aviation stresses that this consistency corroborates its interpretation of the lease agreements. This argument, however, ignores the fact that the parties did, in fact, amend their prior agreements, and the Court presumes they did so for a reason – to alter the lease agreements.

ORDER – PAGE 13

Accordingly, the Court finds that Southwest owes compensation for a total shortfall of 313 days, which it has already paid to MK Aviation. Therefore, the Court grants summary judgment to Southwest on MK Aviation's "D" check claim, as well as on Southwest's counterclaim for breach of contract.

### C. Landing Gears

Section 5.3.2 requires Southwest to return the Aircraft with "a minimum of 50% of the time remaining on each of the main and nose [landing] gears until the next scheduled shop visit or retirement, as the case may be." If Southwest failed to comply with this provision, section 5.4.2 obligated Southwest to compensate MK Aviation based on the shortfall.

The parties disagree as to the specific nature of Southwest's obligations under sections 5.3.2 and 5.4.2. Southwest interprets section 5.3.2 to require it to return the Aircraft with a minimum amount of time remaining until the next scheduled shop visit *or* retirement of the landing gears, whichever occurs first. Under this interpretation, Southwest claims that it must compensate MK Aviation for failing to return the Aircraft with the minimum required time until retirement only if there are no intervening shop visits scheduled. MK Aviation, however, claims that section 5.3.2 requires that, at return, the landing gear have a minimum amount of time remaining until the next scheduled shop visit *and* until retirement, regardless of which event comes first. According to MK Aviation, Southwest owes compensation if it fails to return the Aircraft with at least half of the time remaining until retirement of the landing gear, even if there is an intervening shop visit scheduled.

ORDER – PAGE 14

The Court agrees with Southwest's interpretation of sections 5.3.2 and 5.4.2 because, unlike MK Aviation's interpretation, it gives full effect to the language of both sections. First, the language of section 5.3.2 suggests that the next event in time, whether the next scheduled shop visit or retirement of the landing gear, be utilized for purposes of determining whether Southwest has complied with the provision. Section 5.3.2 states that Southwest must return the Aircraft with a minimum of fifty percent of time remaining until the "next scheduled shop visit *or* retirement, *as the case may be*." The use of "or" and "as the case may be" indicates that the drafters of the lease agreements anticipated the occurrence of alternate events. Southwest's interpretation is consistent with that intent. MK Aviation's interpretation, however, reads "or" as "and" and nullifies the phrase "as the case may be."

Furthermore, the Court notes that MK Aviation's interpretation is inconsistent with the express terms of section 5.4.2, which provides the methodology for determining the amount of compensation Southwest owes if it fails to comply with section 5.3.2. Section 5.4.2, however, refers to only "the next scheduled shop visit," stating that the amount of compensation Southwest owes must be determined in reference to the "number of hours (or cycles, if applicable) remaining until the *next scheduled shop visit* for such gear." The omission of any reference to retirement of the landing gear in section 5.4.2, coupled with the parenthetical phrase "*or* cycles, if applicable," indicates that section 5.4.2 contemplates the payment of compensation based on alternate situations, as opposed to the occurrence of both situations at the same time (as MK Aviation suggests). *See* RANDOM HOUSE WEBSTER'S

UNABRIDGED DICTIONARY 1390 (2d ed., 2001) (explaining that "or" is a conjunctive used to "connect words, phrases, or clauses representing alternatives").

MK Aviation argues that Southwest's interpretation renders meaningless the words "minimum" and "retirement" in section 5.3.2. The Court finds this argument unpersuasive. When considering section 5.3.2 in its entirety, it is clear that the words "minimum" and "retirement" continue to have meaning under Southwest's interpretation. Section 5.3.2 uses the conjunction "or" between "next scheduled shop visit" and "retirement," and adds the phrase "as the case may be." This language clarifies that when Southwest returned the Aircraft, the landing gears must have, at minimum, fifty percent of time remaining until one of two events (hence, the word "or"), one of which is the retirement of the landing gear.

Accordingly, the Court finds that the amount of time remaining on the nose and main landing gears must be measured according to whichever event – the next scheduled shop visit or retirement of the landing gear – comes first.

### D. Rental Payment

MK Aviation alleges that Southwest breached the lease agreements by improperly tendering the Aircraft on October 15, 2004. Section 5.4 of the lease agreements specifies that if Southwest failed to return the Aircraft on October 15, 2004, its obligations under the lease would continue to be in effect until the Aircraft is officially returned, including Southwest's obligation to pay rent. Based on this provision, MK Aviation claims it is entitled to additional rent covering the period from October 15, 2004 to November 5, 2004, when the parties executed the Return Acceptance Receipts to memorialize the return of the Aircraft

and the termination of the lease. Southwest moves for summary judgment on this claim, arguing that MK Aviation waived its claim to additional rent by signing the Return Acceptance Receipts.

Under Texas law, a party may explicitly or implicitly waive a contractual right. A party waives a right when it "intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming that right." *In re Epic Holdings, Inc.*, 985 S.W.2d 41, 57 (Tex. 1998). In determining whether MK Aviation waived its right to the additional rental payment, the Court "must look to the acts, words or conduct of the parties," through which an intent to abandon the right must be "unequivocally manifested." *Marriott Corp. v. Azar*, 697 S.W.2d 60, 65 (Tex. App. – El Paso 1985, no writ). Although whether a party has waived a known right is ordinarily a question of fact, when the facts and circumstances are admitted or clearly established, waiver becomes a question of law. *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996). Because waiver is an affirmative defense, a defendant who moves for summary judgment on the basis of waiver bears the burden of establishing its occurrence. *Alford, Meroney & Co. v. Rowe*, 619 S.W.2d 210, 213 (Tex. App. – Amarillo 1981, writ ref'd n.r.e.).

A party may indicate its intent to waive a known right in one of three ways. First, a party's express renunciation of a known right establishes a waiver of the right. *Id.* Second, a party's silence or inaction for an unreasonable period, together with knowledge of the right, may also indicate an intent to waive the right. *Id.* Third, a defendant may also establish waiver by demonstrating that the party who knowingly possessed the right acted in such a

nature as to mislead the [defendant] into a honest belief that the party assented to waiving the right. *Id.*

Here, the question presented to the Court is whether MK Aviation clearly expressed its intent to waive its claim for additional rent. The Court finds that it did not. Paragraph 6 of the Return Acceptance Receipts states that "Lessor confirms that Lessee's obligation to pay Rent is *hereby* terminated," which indicates that MK Aviation intended to relieve Southwest of its obligation to pay rent as of the date the parties executed the Return Acceptance Receipts – November 5, 2004. The Return Acceptance Receipts do not reflect MK Aviation's intention to waive its claim to rent for the period from October 15, 2004 to November 5, 2004. Furthermore, the Court finds that the failure to explicitly reserve the claim to additional rent in paragraph 4 of the Return Acceptance Receipts is not dispositive, as Southwest suggests, because the return agreements expressly address the subject of rental payments in paragraph 6. Accordingly, the Court denies Southwest's motion for summary judgment with respect to MK Aviation's rental payment claim.

MK Aviation also moves for summary on its rental payment claim, arguing that section 5.4 clearly establishes that Southwest's obligation to pay rent continued until the termination of the lease and return of the Aircraft on November 5, 2004. The parties, however, dispute the facts surrounding Southwest's tender of the Aircraft on October 15, 2004 and the basis of MK Aviation's refusal to accept the Aircraft on that date. MK Aviation alleges that Southwest's failure to supply MK Aviation with updated maintenance records, specifically those relating to the last "C" check of the Airframe, prevented MK

ORDER – PAGE 18

Aviation from accepting the Aircraft on October 15, 2004. However, Michael Kortschak, the Corporate Finance Manager for Southwest, stated in his affidavit that Southwest tendered the Aircraft on October 15, 2004 and that MK Aviation refused to accept the Aircraft due to Southwest's alleged noncompliance with the return conditions set forth in the lease. Accordingly, the Court concludes that there exists a genuine issue of material fact regarding the return of the Aircraft; therefore, MK Aviation's motion for summary judgment is denied with respect to its rental payment claim.

### IV. MK AVIATION'S QUANTUM MERUIT AND UNJUST ENRICHMENT CLAIMS

As an alternative to its breach of contract claims, MK Aviation asserts claims for quantum meruit and unjust enrichment related to Southwest's excess use of the Aircraft's airframes, engines, and landing gear, as well as to its extended possession of the Aircraft. Southwest moves for summary judgment on these claims as well, arguing that the lease agreements preclude MK Aviation from recovering under these equitable theories. The Court agrees.

Texas recognizes certain rights to restitution under theories of implied and quasi-contract, including the equitable doctrines of quantum meruit and unjust enrichment. *Matagorda County v. Tex. Ass'n of Counties County Gov't Risk Mgmt. Pool*, 975 S.W.2d 782, 784 (Tex. App. – Corpus Christi 1998), *aff'd*, 52 S.W.3d 128 (Tex. 2001). However, a party generally cannot recover under a quasi-contract theory when there is a valid, enforceable contract addressing the subject matter of the parties' dispute. *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000); *see also Pepi Corp. v. Galliford*, No. 01-

ORDER – PAGE 19

05-00788-CV, 2007 WL 441582, at *4 (Tex. App. – Houston [1st Dist.] Feb. 8, 2007, no pet. h.) ("A plaintiff seeking to recover the reasonable value of services rendered or materials supplied is precluded from recovering in quantum meruit if there is an express contract *that covers those services or materials* and if no exception applies.") (emphasis in original); *R. Conrad Moore & Assocs., Inc. v. Lerma*, 946 S.W.2d 90, 96–97 (Tex. App. – El Paso 1997, pet. denied) ("Restitution under principles of unjust enrichment is appropriate where a contract is unenforceable, impossible, not fully performed or void for other legal reasons."). Here, the lease agreements expressly address the amount of compensation, if any, owed to MK Aviation based on the return condition of the Aircraft. The lease agreements also provide for the payment of additional rent in the event that Southwest fails to timely return the Aircraft. The intent of these provisions is to compensate MK Aviation for Southwest's use of the Aircraft. The subject matter of MK Aviation's claims for quantum meruit and unjust enrichment is directly covered by the terms of the lease agreements, which are valid and binding agreements. Accordingly, MK Aviation may not recover on its quantum meruit or unjust enrichment claims.

MK Aviation argues that its claims for quantum meruit and unjust enrichment are viable "[t]o the extent that [Southwest's] consumption of the useful life of the airframe, engines, and landing gear is not covered by the lease agreements . . . ." But MK Aviation does not explain how, or to what extent, Southwest's use of the Aircraft is not covered by the lease agreements. Rather, it appears to argue that if the Court's interpretation of the lease agreements does not provide the *amount* of compensation MK Aviation believes Southwest

ORDER – PAGE 20

owes, then the lease agreements fail to cover Southwest's consumption of the useful life of the Aircraft.  In support of this contention, MK Aviation highlights the disparity between the economic value of the Aircraft at its return and the amount of compensation owed under the lease agreements.  But as previously stated, the Court concludes that the terms of the lease agreements expressly cover the subject of MK Aviation's quantum meruit and unjust enrichment claims.  The fact that enforcement of the lease agreements disadvantages MK Aviation is not, in and of itself, grounds for recovery under either a quantum meruit or unjust enrichment theory, especially given that such recovery would be inconsistent with the express terms of the lease agreements.  *See Fortune Prod. Co.*, 52 S.W.3d at 685 (finding that "[a] cause of action for unjust enrichment is not available to recover payments in addition to the contract price the parties agreed upon for the gas stream," the subject of plaintiff's unjust enrichment claim); *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 42 (Tex. 1992) ("Unjust enrichment is not a proper remedy merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss to the claimant, or because the benefits to the person sought to be charged amount to a windfall.") (internal quotations omitted).

Accordingly, the Court grants Southwest's motion for summary judgment with respect to MK Aviation's claims for quantum meruit and unjust enrichment.

## CONCLUSION

The Court finds that Southwest has proffered the correct interpretation of the lease agreements with respect to the required return condition of the engines, airframes, and

landing gears of the Aircraft.  The Court thus grants Southwest's motion for summary judgment with respect to MK Aviation's breach of contract claims related to the return condition of the Aircraft and denies MK Aviation's motion for summary judgment with respect to those claims.  The Court also grants summary judgment for Southwest on MK Aviation's claims for quantum meruit and unjust enrichment.  Additionally, the Court finds that MK Aviation did not waive its claim to additional rent; therefore, the Court denies Southwest's motion for summary judgment with respect to MK Aviation's rental payment claim.  Furthermore, having found that a genuine issue of material fact exists regarding the return of the Aircraft, the Court also denies MK Aviation's motion for summary judgment with respect to its rental payment claim.

The Court will, by separate order, reset this case for trial.


SIGNED March 9, 2007.


_____
David C. Godbey
United States District Judge

ORDER – PAGE 22